# IN THE UNITED STATES DISTRICT COURT FOR THE
# NORTHERN DISTRICT OF FLORIDA
# TALLAHASSEE DIVISION

HALA FARID,

       Plaintiff,

v.                             CASE NO.  4:12cv621-RH/CAS

PATRICK R. DONAHOE,
POSTMASTER GENERAL,
UNITED STATES POSTAL SERVICE,

       Defendant.

_____/

## ORDER GRANTING SUMMARY JUDGMENT

This is an employment-discrimination case.  The plaintiff Hala Farid, a Postal Service letter carrier, asserts a multitude of claims.  The case is a paradigm of substantive and procedural deficiencies that the Eleventh Circuit has railed against, time and again.

First, Ms. Farid asks the court to sit as a super-personnel department.  *See, e.g.*, *Chapman v. A1 Transport*, 229 F.3d 1012, 1030 (11th Cir. 2000); *Elrod v. Sears, Roebuck & Co.*, 939 F.2d 1466, 1470 (11th Cir. 1991).  She raises petty complaints too numerous to count.  She also raises more significant matters.  The

petty complaints could properly be addressed through the union grievance process, if at all.  Neither the petty complaints nor the more significant assertions show discrimination of the kind prohibited by the civil-rights statutes.

Second, Ms. Farid travels on a shotgun pleading and has yet to set out her claims in an understandable way, even after having been ordered to provide specific information that would have facilitated analysis of the claims.  *See, e.g.*, *Paylor v. Hartford Fire Ins. Co.*, 748 F.3d 1117, 1125-26 (11th Cir. 2014) (decrying shotgun pleadings and collecting earlier cases doing the same).

This order grants the defendant Postmaster General's summary-judgment motion.

## I

Ms. Farid began work for the Postal Service in 2005.  She submitted literally hundreds of grievances.  In her deposition, she testified that when she was dissatisfied with the outcome on a grievance, she submitted an EEO complaint, using the EEO process to appeal the unsatisfactory grievance outcome.  ECF No. 22-1 at 21.  The record confirms that that was indeed her approach.

Ms. Farid's amended complaint set out a series of allegations that it then incorporated in full into each of four separate counts.  The counts alleged violations of the Americans with Disabilities Act and Title VII of the Civil Rights Act of 1964—more specifically, disability discrimination, national-origin

discrimination, race discrimination, and retaliation for complaining about disability, national-origin, and race discrimination.  The amended complaint made no attempt to sort the factual allegations by the counts to which they related.

Nor did Ms. Farid sufficiently clarify her claims during discovery or in response to the Postmaster General's summary-judgment motion.  Faced with an impenetrable jumble of disjointed allegations, some administratively exhausted and some not, and after an unsuccessful effort to sort it out at oral argument, I entered an order requiring Ms. Farid to provide specific information.

Many of Ms. Farid's claims were trivial; they did not involve adverse employment actions and were not otherwise actionable.  But at least two categories of claims *did* allege adverse employment actions.  Ms. Farid claimed that her pay was shorted—that she was not paid the full amount due for the routes she carried or work she performed.  And she claimed she was denied promotions.  It was not clear, though, what Ms. Farid really claimed—when she was underpaid, what promotions she was denied, and whether any specific claim was administratively exhausted or included in the amended complaint.  A proper complaint and summary-judgment response would list the shorted pay and missed promotions, but Ms. Farid's amended complaint and summary-judgment response did not do so.

I probably could and should have granted summary judgment at that point. *See* Fed. R. Civ. P. 56(c)(3) (providing that on a summary-judgment motion, a court need not consider materials that are not cited); Fed. R. Civ. P. 56(e) (providing that when a party opposing summary judgment fails to properly address another party's assertion of fact, the court may consider the fact undisputed for purposes of the motion). But I gave Ms. Farid another opportunity to provide the missing information. I directed Ms. Farid to file the following:

(1) For each alleged underpayment of wages,

   (a) the date of the underpayment and work days it covered,

   (b) the amount underpaid,

   (c) each date when all or part of the underpayment was corrected,

   (d) the amount still owed,

   (e) any explanation of the underpayment by the Postal Service shown in the record, and

   (f) any explanation of the underpayment by Ms. Farid shown in the record,

   (g) a citation to the record (by ECF number and page) showing exhaustion of the claim, and

   (h) a citation to the complaint (by paragraph number) showing that the claim was asserted in this action.

(2) For each promotion or route Ms. Farid allegedly was denied,

   (a) the position or route number or comparable identifier,

      (b) the date when the position or route was filled,

      (c) the person who obtained the position or route,

      (d) the difference obtaining the promotion or route would have made to Ms. Farid in pay or other terms and conditions of employment,

      (e) in 50 words or fewer, Ms. Farid's argument on what the Postal Service did wrong,

      (f) a citation to the record (by ECF number and page) showing exhaustion of the claim, and

      (g) a citation to the complaint (by paragraph number) showing that the claim was properly pleaded.

ECF No. 39 at 1-3.  In response, Ms. Farid did not provide the specified information.  Instead, she tendered more evidence—even though the deadline for filing evidence had long passed—and, without saying so, in effect invited me to figure out for myself the information I had asked Ms. Farid to provide.

## II

      The overall tenor of Ms. Farid's claims is shown by two examples.

      First, Ms. Farid says that while on light duty as a result of asserted injuries, a supervisor asked her to check the windows and doors of postal vehicles in the parking lot to ensure they were locked.  This did not exceed Ms. Farid's medical limitations, but she says this was work properly done by a supervisor, not an employee at Ms. Farid's level.  Ms. Farid says she should not have been asked to

do this task at all and that, because she did it, she should have received supervisor's pay.

Second, Ms. Farid says a supervisor filed a false report that made Ms. Farid look bad. What happened was this. A bat flew into the post office. Ms. Farid and others hurried to get away from the bat. An employee swung a door into Ms. Farid, causing a bruise. A supervisor prepared a report of the incident on the appropriate form. Ms. Farid believed the employee who swung the door should be listed on the form's space for a "third party." At Ms. Farid's insistence, this was done. But on further consideration, the supervisor concluded that a "third party" was someone not employed by the Postal Service and so removed the employee's name from the report. Ms. Farid now accuses the supervisor of filing a fraudulent report.

Perhaps an employee should not be required to check doors and windows. Perhaps an employee should be able to direct a supervisor on how to fill out a report. But few employers would allow an employee that level of control. More importantly, petty complaints of this kind come nowhere close to a violation of Title VII or the Americans with Disabilities Act. And they do not suggest discrimination or retaliation.

### III

On the Postmaster General's summary-judgment motion, disputes in the evidence must be resolved, and all reasonable inferences from the evidence must be drawn, in favor of Ms. Farid, as the nonmoving party.  This section sets out the facts that way, attempting to bring some order to the jumble of facts that are most relevant to Ms. Farid's multitude of claims.

Ms. Farid has worked for the Postal Service in Tallahassee since 2005, always as a rural carrier.  She identifies her race as white and her national origin as Egyptian.

**2007-2009.**  In 2007 Ms. Farid was injured in an automobile crash while delivering mail.  A doctor diagnosed Ms. Farid with a concussion and placed her on work restrictions.  *See, e.g.*, ECF No. 25-18 at 2 (limiting her work to one four-hour shift per day).

**2009.**  In May 2009, Ms. Farid wrote to the Postal Service that she would be released by her doctor on May 22, 2009, and was looking forward to going back to work full time.  She also asked to be promoted to a 204b position—a role with higher status and pay in which an employee may serve as supervisor on the floor when management schedules the employee to do so.

At some point, Ms. Farid was cleared to work eight hours with some restrictions (no lifting or driving with a headache).  *See* ECF No. 22-1 at 7

(deposition page 22).  The precise date is unknown, but it may have been in May 2009.  Regardless, by August 2009, it appears that Ms. Farid was again limited to working no more than four hours a day.  *See* ECF No. 26-1 at 2.

Ms. Farid says that while she was on limited duty, the Postal Service required her and other limited-duty workers to sit in a cold, empty warehouse and that she was prohibited from talking or eating.  This is not mentioned in the amended complaint or EEO charges.  Ms. Farid says that due to her prolonged sitting, she went to the hospital on December 12, 2009.  A doctor wrote a note that Ms. Farid was restricted from lifting any weight and could not return to work until December 16, 2009.  The note stated that after December 16, 2009, Ms. Farid "should be able to participate fully in all work duties."  ECF No. 22-3 at 2.

**January 2010.**  Ms. Farid complained that one of her supervisors—Paul Jones, an African-American—returned her to full duty beginning on January 6, 2010.  *See* ECF No. 27-24 at 12.  This included delivering the mail on regular routes.  Ms. Farid complained several times that returning to full duty violated her regular doctor's work restrictions.  Ms. Farid says that Mr. Jones became angry and yelled at Ms. Farid that she should go home if she didn't know how to do her job—that he had other people who could do it for her.  *See id.* at 12-13.  Other employees witnessed Mr. Jones yelling at Ms. Farid.  Ms. Farid worked the routes as she was required in January, working several days in excess of eight hours with

Mr. Jones yelling at her for complaining about headaches or not finishing all the work he gave her on time.  *See* ECF No. 27-1 at 19 (listing several days in January and February that Ms. Farid complained that she was forced to work more than eight hours).

Ms. Farid's doctor completed a work-restriction form and a light-duty status report on January 15, 2010.  *See* ECF No. 22-4; 26-3.  The form stated that Ms. Farid needed to be on light duty, limited her ability to lift more than ten pounds, and limited her total work hours to eight per day, six days a week.  It also stated that Ms. Farid could not drive with a headache.  This form may not have been sent to Mr. Jones until February 3, 2010—*see* ECF No. 26-3 at 2—but the Postmaster General admits that someone at the Postal Service may have received it on January 15, 2010—*see* ECF No. 22 at 7-8.  Nonetheless, Ms. Farid claims that the Postal Service worked her more than eight hours daily several times during January 2010.

Ms. Farid also claims that Mr. Jones routinely did not pay her appropriately. She states that Mr. Jones reduced the hours she actually worked, refused to pay her overtime, or otherwise paid her improperly.  In one instance, Mr. Jones asked T.J. Sparks, one of Ms. Farid's coworkers, to switch routes with Ms. Farid because Ms. Farid was unfamiliar with the route she had been assigned.  Despite the switch, Ms. Sparks was paid to work the route Ms. Farid actually worked, which was the higher paid route.

On January 29, 2010, Ms. Farid contacted an EEO dispute resolution specialist.

**February 2010.**  Ms. Farid met with the EEO specialist on February 17, 2010, and reported that she was being discriminated against because she was being underpaid, humiliated and threatened, and forced to work outside of her work limitations.

On February 18, 2010, Ms. Farid submitted a written request to return to light duty due to her doctor's medical restrictions.  ECF No. 24-3.  On February 24, 2010, she was given a modified-assignment offer to "case" the mail (that is, sort it by address) and deliver rural routes as needed and to perform other administrative duties.  *See* ECF No. 26-14.  The offer limited her time performing the tasks to one to eight hours and said that she would not lift more than 10 pounds nor drive with a reported headache.  Ms. Farid accepted the offer only if her doctor approved it.  *See id.*  She sent a letter the same day requesting to not be assigned delivering the mail because of her medical restrictions.  *See* ECF No. 26-18.  She also wrote that she verbally requested limited duty December 16, 2009, and January 2, 2010.

Ms. Farid sent a letter on February 27, 2010, stating that she had not yet gotten her work assignment approved and thus should still be assigned work according to her last modified assignment offer proposing limited duty.  *See* ECF

No. 26-19.  She also sent a letter the same day requesting as a reasonable

accommodation that she not be assigned to deliver mail on any routes.  *See* ECF

No. 22-7.  She complained that her new modified assignment offer was not a

limited job offer because she could not carry the mail within her medical

restrictions.  She also filed a grievance with the union complaining that she should

not have to perform the work until she had an opportunity to get her doctor's

permission.  *See* ECF No. 24-29 (denying the grievance on March 2, 2013).

During one week that ran from the end of February until early March,

Andrea Weatherspoon—an African American supervisor—asked Ms. Farid to

check the doors and windows of all the Postal Service delivery vehicles to make

certain they were locked.  Ms. Farid complained that she was singled out to do this

work because it was cold outside and that it was supervisor's work that Ms.

Weatherspoon should be doing.  Ms. Farid also complained that it violated her

work restrictions.  Finally, Ms. Farid complained that she was not paid at a

supervisor's rate during the limited time that she performed this work.

The record shows, however, that it was normal for a supervisor to ask a

carrier, clerk, or "anyone" to perform supervisory work, such as checking on the

doors and windows of Postal Service vehicles at night.  ECF No. 27-27 at 44.  A

supervisor also said that "[t]here's no such thing" as getting higher pay for the

limited amount of time an employee spends working on supervisory tasks.  *Id.*

This is because "once you go on the higher pay, you are getting higher pay for the entire day." *Id.*

**March 2010.**  On March 9, 2010, a bat flew into the post office.  Ms. Farid and several other employees were running from the bat.  One employee, Tammee Davis, was exiting a door and slammed it into Ms. Farid's chest.  Ms. Davis apparently does not dispute that she injured Ms. Farid, though evidence of this is an unsworn written statement.  *See* ECF No. 27-19.  A doctor diagnosed Ms. Farid with a contused chest.  The doctor released Ms. Farid to "regular work" the following day.  *See* ECF Nos. 26-4, 27-15.

Ms. Weatherspoon wrote a report to be filed with the Department of Labor.  Ms. Farid was upset that the report made it seem like she injured herself.  She made Ms. Weatherspoon write Ms. Davis's name on the form as the third party who injured Ms. Farid.  Ms. Farid then signed the form.  *See* ECF No. 27-18.  Ms. Farid testified that she overheard Ms. Weatherspoon on a conference call with the Postmaster about the incident and that the Postmaster was telling Ms. Weatherspoon how he wanted the incident report written up.  *See* ECF No. 27-24 at 17 (¶ 33).  Ms. Weatherspoon denied that she was on a conference call with the Postmaster about this incident.  *See* ECF No. 22-17 at 4.

Ms. Farid later learned that the form Ms. Weatherspoon sent to the Department of Labor had "white out" over Ms. Davis's name.  *See* ECF No. 22-23.

Ms. Farid complained that Ms. Weatherspoon falsified forms and tried to make her look bad by putting papers in her employee file that suggest she injures herself. The Postmaster General apparently admits that Ms. Weatherspoon removed Ms. Davis's name from the form. *See* ECF No. 22 at 10. Ms. Weatherspoon testified that Ms. Davis could not be a third party because she was a coworker and only people outside the office could be third parties. *See id.*

Ms. Weatherspoon did not otherwise indicate Ms. Davis's involvement in the accident on the form, and she did not submit to the Department statements from Ms. Farid and Ms. Davis about the incident. Ms. Farid's worker's compensation claim was denied. Ms. Farid testified that she resubmitted the paperwork with Ms. Davis's name included and the statements about the incident. Her claim was then approved.

On March 11, 2010, the union and Postal Service management agreed that Ms. Farid's limited-duty job offer would be rewritten without delivery duties as a part of the offer. On March 31, 2010, Ms. Farid signed a new limited-duty job offer that said her duties would be "[s]itting." ECF No. 22-8 at 2-3.

**April 2010.** On April 29, 2010, Ms. Farid filed a formal EEO charge (this was combined with her earlier charges from January). Ms. Farid claimed race, national-origin, and physical-disability discrimination, as well as retaliation for contacting the EEO in January and February. She listed 15 complaints, but many

were duplicative.  *See* ECF No. 25-13 (complaining that: (1) her injury-report records from the bat incident were falsified and false information was given to the Department of Labor; (2) her supervisors forced her to perform work outside her doctor's restrictions, including the types of work performed and the length of hours she was required to work; (3) she was reported on a district-manager report for taking too long with her shift while she was improperly exceeding her doctor's restrictions; (4) she was being paid improperly; (5) she was treated differently than other limited-duty employees; (6) she was not given reasonable accommodations when she asked for them; (7) she was taken advantage of by being asked to do supervisor's work without receiving supervisor's pay for it; (8) she felt that she was being treated worse after filing her first EEO charge than before; and (9) she had to do clerk's work, which was the subject of  a then-pending clerk craft union grievance).

In two EEO investigative affidavits dated June and July 2010, Ms. Farid also wrote that she wasn't being considered for supervisory positions because of her national origin and that management was taking advantage of her.  *See* ECF Nos. 22-12 at 17, 22-12 at 7.

**October 2010.**  Ms. Farid was not scheduled for any hours the first week of October.  Following this week, Ms. Farid's doctor released her to return to full duty.  A supervisor, Mr. Jones, scheduled Ms. Farid for driver's training on

October 18, 2010.  But according to Ms. Farid, Mr. Jones never told Ms. Farid where and when to report for training.  Ms. Farid tried to contact Mr. Jones by phone and email.  He never responded.

Ms. Farid was contacted the morning of her training after her training had already started.  She reported to training late.  A supervisor showed up to give her an "absent without leave" form.  Ms. Farid complained that such a form was for absences, not tardiness, and that she had tried several times to figure out where her training was going to be located.  She refused to sign the form and filed a grievance and EEO complaint, which was settled.  *See* ECF No. 27-13.

Ms. Farid alleges that she was passed over in the seniority matrix several times when routes were given out.  The specifics of these incidents are unclear.

**January-February 2011.**  On one day, coworker Josephine Davis was parked in Ms. Farid's spot.  Ms. Farid parked behind her.  Mr. Jones asked Ms. Farid to move her car.  Ms. Farid asked Mr. Jones and Ms. Davis to wait five minutes.  Mr. Jones asked her to move her car immediately.  As she did, Ms. Farid says that Ms. Davis was taunting her and Mr. Jones was nodding with approval.  Ms. Farid complained and wrote a letter complaining that management was encouraging violent and hostile behavior in the workplace.  *See* ECF No. 24-5.  She accused Mr. Jones of yelling at her and humiliating her in front of others.

Apparently, Ms. Farid also parked behind another employee in February. Afterward, Mr. Jones gave Ms. Farid a letter of warning, which she claims was harassment and unfair.  The letter of warning said Ms. Farid parked behind cars of other employees not once, but twice, and after Mr. Jones explicitly told her not to do so.  *See* ECF No. 24-1.

**April 2011.**  Ms. Farid began working Route 26.  Route 26 involves delivering the mail six days a week.  The sixth day may be a "relief day."  Ms. Farid wanted to work the relief day as well.  Instead, Mr. Jones gave the relief day to Nick Robinson, an African American coworker.  Ms. Farid complained that this was favoritism and discrimination against her.

But uncontested testimony shows that management can block a carrier from working a relief day, even on her own route, if working that day would put the carrier over her allotted hours, into overtime.  *See* ECF No. 27-27 at 47-56.  This is governed by the union contract.  It is unclear whether denying Ms. Farid relief days was proper under the contract.  There is no evidence of any connection between this and Ms. Farid's race, national origin, medical condition, or complaints about discrimination.

**May 2011.**  Ms. Farid filed another EEO charge on May 18, 2011.  She claimed that Mr. Jones discriminated against her due to her race and national origin and retaliated against her.  Specifically, she claimed that: (1) Mr. Jones cheated her

in her paychecks and lost one of her time cards; (2) Mr. Jones replaced her with his

favorite substitute carrier instead of following the seniority matrix; (3) Mr. Jones

paid the hours she worked to other employees; (4) Mr. Jones gave her the letter of

warning for no reason; (5) Mr. Jones mistreated and humiliated her; and (6) the

errors in her pay checks ruined her credit.  *See* ECF No. 27-10.

**July 2011.**  Ms. Farid became upset that a supervisor gave her a formal

discussion on July 12, 2011.  Apparently, the supervisor had received a phone

complaint that Ms. Farid had pushed a customer's trash cans with her mail truck,

had misdelivered mail, and was rude to a customer while on delivery.  Ms. Farid

wrote a letter to the acting manager of the station.  *See* ECF No. 26-20.  She

alleged that the supervisor's formal discussion with her was harassment and

discrimination against her and that the Postal Service management was working to

get rid of her.  But no admissible evidence contradicts the supervisor's assertion

that a customer complained.

**August 2011.**  Ms. Farid had been working Route 26 since April 2011.  A

bid was held on Route 81.  Ms. Farid testified that supervisor Peggy Senor told her

that if she did not bid on Route 81, she would lose her seniority.  Ms. Senor denies

that she told Ms. Farid that she had to bid on Route 81.  *See* ECF No. 22-13 at 2.

Ms. Farid bid on Route 81.  After the bid, Ms. Farid realized that Route 81

was half the hours she had been working on Route 26 and that she did not need to

bid on Route 81 to keep her seniority or benefits.  On August 31, 2011, Ms. Farid

wrote Ms. Senor a letter asking to stay on Route 26 and to relinquish Route 81.

The letter states that Ms. Farid had called Ms. Senor several times and left

messages for her before the bid that she was "trying to understand my benefits and

the working hours" for Route 81.  ECF No. 26-21.  Ms. Farid also apologized for

the inconvenience.  Ms. Farid did not accuse Ms. Senor of telling her that she had

to bid on the route or lose her seniority in the letter.

**September 2011.**  Route 26 was noticed for rebid.  Ms. Farid wanted to bid

on Route 26, but Ms. Senor would not let her.  Ms. Farid testified that union

executive David Heather told Ms. Farid that she had a right to Route 26 and could

get it back by giving Ms. Senor written notice.  Mr. Heather, however, emailed Ms.

Farid on September 5, 2011, telling her that she would not be allowed to get her

old route back because she relinquished it for Route 81.  *See* ECF No. 29-1 at 4-5.

**November 2011.**  Ms. Farid received an abnormally large paycheck.  She

testified that she believed that it was because the Postal Service was finally paying

her what she had been owed.  In reality, the Postal Service accidentally overpaid

her thousands of dollars.  She testified that she spoke with a supervisor about it in

November 2011, but that supervisor told her not to do anything.

Ms. Farid met with the acting Postmaster to try to resolve her longstanding

complaint that her supervisors were routinely underpaying her.  She was told that

she could access her pay records to compare her timesheets with her paychecks.

Ms. Farid testified that she was given the runaround, was unable to find the

documents that she needed, and that several supervisors told her they were all too

busy to help her.

**February 2012**.  Ms. Farid testified that she emailed the Postmaster about

the overpayment.  The email is not in the record.  She also testified that she was

trading emails with another supervisor about the overpayment.

**June-August 2012**.  At some point, Ms. Farid began receiving calls from

collections about the money she owed the Postal Service.  The Postal Service

asked Ms. Farid to repay $2,169.47 in a letter of demand.  *See* ECF No. 26-13.

This letter of demand was dated June 20, 2012.  Ms. Farid says she received it on

July 26, 2012.  Ms. Farid also complained that Ms. Senor accused her of

defrauding the Postal Service.

Ms. Farid testified that she filed a grievance on July 26, 2012, to resolve the

overpayment issue.  *See* ECF No. 25-1.  Ms. Farid was concerned that she was

being asked to return money on which she had already paid taxes.  The Postmaster

General asserts that Ms. Farid did not timely file a grievance on the overpayment

after receiving the letter of demand.

**December 2012**.  Ms. Farid filed another EEO complaint on December 22,

2012.  She complained that two of her supervisors were discriminating against her

based on race and national origin and retaliating against her.  She complained that

(1) Ms. Senor mishandled the overpayment issue and the issue was still pending;

and (2) supervisor Paris Jones allowed another employee to make overtime while

Ms. Farid was available to work.  *See* ECF No. 27-11.

On December 3, 2012, Ms. Farid filed this lawsuit.

**July 2013.**  On July 19, 2013, the parties settled the grievance by reducing

the $2,169.47 owed to $1,084.74.  *See* ECF No. 27-31.  Ms. Farid apparently had

repaid the Postal Service $40 by the time the grievance was settled.

On one day Ms. Farid was sorting the mail.  She left her area to help another

employee.  A district-office employee conducting an inspection saw that Ms. Farid

had stacked a number of periodicals to the side.  The inspector wrote a report that

Ms. Farid was hiding mail and not delivering it.  Ms. Farid testified that she told

the inspector that she was not finished delivering mail for that day and that she

delivered the periodicals after their conversation.

The next day, Ms. Farid was verbally reprimanded in front of a group of

employees about the fact that she was hiding mail.  A supervisor told Ms. Farid

that as a rural carrier, she could be terminated more easily than a regular carrier.

The supervisor also told Ms. Farid that the supervisor was given a low score

following the district employee's inspection, and that the supervisor was going to

take Ms. Farid with her when she got in trouble for it.  Ms. Farid wrote a letter (it

is unclear to whom) about how she was treated that day.  *See* ECF. No. 26-12.  Ms.

Farid also filed a grievance.  *See* ECF No. 25-2.  And she may have filed an EEO

charge as well.  *See* ECF No. 22-1 at 43 (page 167).

On July 29, 2013, Ms. Farid filed her amended complaint.  *See* ECF No. 12.

## IV

Ms. Farid has proffered no direct evidence of discrimination or retaliation.

When an employee relies on circumstantial evidence in support of a claim, the

employee may proceed under the familiar burden-shifting framework set out in

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and later cases.  Under

that framework, an employee first must present a prima facie case.  The employer

then must proffer a legitimate nondiscriminatory reason for its decision.  The

employee then must show that the proffered reason was not the real reason for the

decision and that instead a reason was discrimination.  Alternatively, the employee

may present other evidence from which a reasonable factfinder could infer

prohibited discrimination.  *See*, *e.g.*, *Smith v. Lockheed-Martin Corp.*, 644 F.3d

1321, 1328 (11th Cir. 2011).

Ms. Farid's shotgun approach makes it difficult to apply the burden-shifting

framework.  She says she was underpaid, but she does not say when or why; she

stonewalled my effort to sort this out.  She asserts petty slights—having to check

the locks on doors and windows, or not having a witness listed on an incident

report—but those plainly do not rise to the level of a Title VII or ADA violation.

She says she was not promoted, but she does not say to what position or when, or

who got the job, and again she stonewalled my effort to sort this out.

The bottom line is this.  Ms. Farid has not made out a prima facie case of

discrimination or retaliation.  Ms. Farid has not overcome the Postal Service's

legitimate, nondiscriminatory explanation for any underpayment: that any

underpayment was simply a mistake that could and would be remedied upon

submission of information showing the mistake.  Ms. Farid has not overcome the

Postal Service's legitimate, nondiscriminatory explanation for promotions: that it

was following the union contract, awarding routes to the bidder entitled to the

route under the contract.  And most importantly, Ms. Farid has not presented any

evidence that she suffered any mistreatment at all based on her race, national

origin, or medical condition, or in retaliation for complaining about discrimination

on these grounds.

V

For these reasons,

IT IS ORDERED:

1.      The Postmaster General's summary-judgment motion, ECF No. 22, is

granted.

2.     The clerk must enter judgment stating, "The plaintiff Hala Farid's claims against the defendant Patrick R. Donahoe in his official capacity as Postmaster General of the United States Postal Service are dismissed with prejudice."

3.     The clerk must close the file.

SO ORDERED on January 5, 2015.

s/Robert L. Hinkle_____
United States District Judge